## WHITEHOUSE v. EDWARDS.

(Circuit Court of Appeals, Ninth Circuit. February 11, 1907.)

No. 1,351.

1. NEGLIGENCE—WHEN QUESTION FOR JURY—CONFLICTING TESTIMONY.

An action to recover for a personal injury, alleged to have resulted from defendant's negligence, was properly submitted to the jury, where, although there was direct and positive testimony to a fact which would tend to acquit defendant of negligence, there was other testimony and circumstances tending to discredit it, and to make it proper for the jury to determine its credibility.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, § 298.]

2. SAME—INSTRUCTIONS—REFUSAL OF REQUESTS.

The action of a trial court in giving and refusing instructions, in an action for personal injury, held without error.

In Error to the District Court of the United States for the Second Division of the District of Alaska.

Henry M. Hoyt, James W. Bell, and Edward W. Rice, for plaintiff in error.

George D. Schofield and Albert H. Elliot, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. On September 17, 1904, the Johnston Lighterage Company was under contract with the Nome Fuel Company to transport fuel oil from the ship Rosencranz to the shore at Nome, Alaska. Its engagement was to bring the lighters or barges used for carrying the oil from the ship's side to the beach, and to furnish men for the crafts. In pursuance thereof, it employed the defendant, being the plaintiff in error, to do the towing with his tugs; and the Nome Fuel Company, the consignee, also employed defendant to convey the oil from the barges to shore. The plaintiff was the employé of the lighterage company upon the barges. The defendant used a pump for conveying the oil to shore, which was operated through means of an engine, and a derrick erected for handling a large iron pipe, 6 inches in diameter, and about 60 feet in length, extending from the shore seaward to the barges, with an elbow at right angles at the outer end, and a further extension of 6 feet. The derrick was adjusted to a stationary post, or mast, as it is termed, set in the ground, on the beach near the water's edge, and the engine was stationed farther in shore, so as to make its distance from the barges, while being discharged, about 150 feet; the mast being about 60 feet, or the length of the pipe, from the hatches of such crafts. The defendant had charge of the operation of the engine and derrick for lowering the outer end of the pipe into the holds of the barges, and, when discharged of the oil, for raising it again in place; his place of duty being at the engine. He had in his employ a man at the winch, and another for firing the engine. The duties of plaintiff were to see that the pipe when lowered was conducted into the holds of the barges, and, when being raised, that the

valve thereof did not come in contact with the coamings of the hatch. At the time of the accident of which plaintiff complains, the defendant had hoisted the pipe at a signal from the barge, and, while the plaintiff was replacing the cover upon the hatch, the pipe fell upon him. In this relation, the complaint states that:

"Plaintiff was engaged in the performance of his duties as longshoreman on board one of said oil barges, exercising care and discretion in his work, when without any warning whatever, and in the absence of the watchman, said defendant, who then and there had charge of the hoisting engine, then and there carelessly, negligently, and in a grossly unskillful manner operated said hoisting engine and raised said conduit and suction pipe in such a way as to cause the parting of the lines suspending said conduit and suction pipe, wherein and whereby said pipe was precipitated upon plaintiff and across said barge, thereby inflicting upon plaintiff a painful and dangerous wound," etc.

By the further and separate answer, it is alleged, as a defense, that it was one of the duties of plaintiff to signal to the engineer to hoist the pipe or conduit, and, after the giving of the signal, it was one of his duties also to signal to the engineer to stop hoisting, when, in his judgment, the said pipe or conduit had been raised to a sufficient height, and that the defendant relied solely and acted only upon the signals as given from said plaintiff and his co-employés; that, at the time of the alleged accident, the signal was given by the plaintiff; or one of his fellow servants on the barge, to defendant to hoist the pipe or conduit; that, upon receiving the signal, defendant started the engine. and began hoisting, and continued until the defendant believed he had raised the pipe to a sufficient height, then slowed the engine down almost to a stop, expecting to receive a signal from plaintiff, or his fellow servants, to cease hoisting; that none such was given, but, on the contrary, defendant was given a signal by plaintiff, or his fellow servants, to hoist said pipe still higher, which defendant began to do, when the alleged accident occurred, and before any signal was given to stop hoisting.

Replying, plaintiff avers that it was his duty to give the signal to defendant to raise or lower the pipe, but that he gave no such signal at the time of receiving the injury, and that the injury was caused by defendant operating the hoisting engine without a signal from plaintiff, and without giving plaintiff any warning whatever of his intention to raise the pipe.

This reduces the issue to concise and narrow limits. There was a motion by defendant, at the close of the evidence, for a directed verdict in his favor, which was overruled. The first question, therefore, for decision, is whether the court erred in this disposition of the motion. The special reason urged by counsel for defendant in support of the motion is that the evidence shows, beyond rational controversy, that a signal, consisting of the words "Hoist higher," uttered, or as is otherwise expressed, "sung out," by one Charles L. Johnson, was thus given from the shore or beach in the direction of the barge, and that, defendant having acted upon such signal, supposing that it came from proper authority, his conduct in continuing to hoist the pipe, which caused the parting of the line and the precipitation of the pipe upon the plaintiff, was not such as to render him liable for negligence.

The principal witness for plaintiff, aside from himself, was R. G. Healy, who was under the employ of the lighterage company at the time, and engaged with plaintiff on the barge. His duty was to see that the barge was made fast, and to assist plaintiff in managing the pipe while being lifted and lowered. Both men were on the barge at the time. Healy states that it had been usual to have a man on shore whose duty it was to make the boat fast and to attend to the surf line, and to give the signal to the engineer when to start the engine for hoisting the pipe, also the signal when to lower it; but that, owing to a shortage in help on the barge at the time, he was discharging that duty in connection with assisting plaintiff in lifting and lowering the pipe. He further testifies that, when the oil had been pumped from the barge, he gave the signal to the engineer (meaning the defendant) to hoist the pipe; that the defendant hoisted it to its accustomed height, and left it there, and walked away from the winch, but that, from three to five minutes afterwards, he started to hoist again, and without giving any signal that he intended to do so; that, in the meantime, plaintiff had returned to the hatch, and was putting the cover upon it, when the pipe fell, and he was injured; that both the witness and the plaintiff stepped away to the outside of the boat while the pipe was being hoisted; but, that after the engineer had stopped hoisting, the plaintiff returned to his work at the hatch, and that there was no signal given by any one to hoist the second time, after the pipe had been made fast.

The plaintiff testifies that he gave the signal to hoist the pipe by singing out to the defendant that the barge was pumped out, and for him to hoist, in the accustomed manner; that defendant hoisted the pipe to the usual height, and sang out, "All right," meaning that the pipe had been made fast; that defendant then stepped down, away from the platform where the engine sat, and that plaintiff started to put on the hatch cover. He says further:

"My business while hoisting the pipe out was to try and keep it clear of the hatchway while they were hoisting the pipe out of the hatch, and see that the coams of the hatch didn't catch the foot of the valve, and it was my business to keep the suction pipe clear of the hatch until she got up so as to clear the hatch, and then it was my business to get out of the road. On this day I naturally gets the pipe out and clear of the coam of the hatch, and, after she has cleared the hatch, I takes my accustomed side, after she is clear of all obstacles. Then the pipe is entirely in the engineer's hands to hoist the pipe up. I generally watched him until he stops the engine and she is fully out up out of the way. The next thing I did I steps to one side on the barge, where I generally holds on while the pipe is being hoisted, which I did on that day. Of course, when they had the pipe out, and it is entirely out of my hands, then the next thing is to cover up the hatch, and, on account of the deck being oily and slippery on account of the oil over the decks, I holds onto the hatch, and gets up alongside to put the cover onto the hatch, and, while I was doing that, the pipe come down on top of me. * * * After the pipe was hoisted to its accustomed and regular height and made fast, I did not signal to the engineer to hoist the pipe up higher, and I don't think Mr. Healy did. * * * It was my duty to place the barge in position on the beach for pumping, to see that the suction pipe was properly lowered into the hatch, and that it cleared the hatch in hoisting. The men on the barge gave the signal when to hoist."

The defendant testifies that he was given the signal to hoist the pipe, and obeyed it, and that, while hoisting it, thinking that it had reached

the proper height, he was given the signal, "Hoist higher," and in obedience thereto he continued with the engine in motion; and that, before any further signal had been given him to stop hoisting, the line broke, and the pipe fell upon the plaintiff; and that both signals came from the direction of the barge. He produced also three other witnesses, each of whom testified that he heard the signal, "Hoist higher," given. One of these was Gifford, who was at the winch managing the rope; another was Adams, who was firing for the boiler at the time, and was standing alongside or near it, being about two feet back of the winch; and one Charles L. Johnson, who says that he not only heard the signal, but gave it himself. He testifies, on cross-examination:

"I gave the signal. I was kind of looking after the Nome Fuel Company to see that none of the oil was being wasted. Capt. Whitehouse had the contract from the Nome Fuel Company to pump this oil. I thought the men on the barge heard the signal, and I didn't see that they were there. They were through with the pumping and with the pipe at the time, and at that time they were not doing anything with it. It might be hard for the men to retain their footing on the barge when it was rough. I claim no authority at that time either through Mr. Whitehouse's employ or under his contract with reference to the discharge of this oil. I was practically a stranger, the same as any other bystander."

He further testifies that, at the time he was on the lower side of the dock, towards the beach, between the mast and the boom, on the west side in front of the dock, 75 or 80 or 100 feet from the pump, about halfway between the beach and the pump.

The plaintiff produced two other witnesses. One was W. H. Smith, who testified that he was working for Johnston, and was down on the beach at the time, about 40 or 50 feet westward from the barge; that he was acting in the capacity of timekeeper, keeping note of the number of barges that were towed in and out; that he saw the pipe when it fell, but that he did not hear the signal given to hoist higher. And Charles A. McArthur testified that he was about 60 feet from the barge, on the beach on the west side, and that he did not hear any one give the signal to hoist higher.

There was some testimony introduced by defendant that the view upon the barge was obstructed somewhat by reason of the derrick and stationary mast and other fixtures, and that it was necessary to depend entirely upon the signals for determining when to hoist or lower the pipe; but the plaintiff's testimony in the case is that the barge was in plain view of the engineer, and that the pipe while being raised, and the men on the barge, and their actions, could all be observed readily by the engineer from his station. So that these are matters also about which the witnesses do not agree.

The rule of the Supreme Court touching the question of fact as to negligence is that it "is one of law for the court only where the facts are such that all reasonable men must draw the same conclusion from them, or, in other words, a case should not be withdrawn from the jury unless the conclusion follows as matter of law that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish." Gardner v. Michigan Central Railroad, 150 U. S. 349, 361, 14 Sup. Ct. 140, 144, 37 L. Ed. 1107. And, again,

it is held, in Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 683, 36 L. Ed. 485, that:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

Now, in the light of the testimony as it has been briefly outlined, it seems clear that there is room for reasonable men to differ touching the fact which counsel make the turning point as to their motion for a directed verdict. Both the plaintiff and Mr. Healy, who was with him on the barge, say positively that they gave no signal after the first to hoist the pipe. Two men who were standing near, and who had equal opportunities with the engineer and the men at the winch or the fireman for hearing such signal, if it was given at all, say that they did not hear it. The testimony of the defendant, it must be conceded, is strong that such a signal was given; four men coinciding and concurring in the statement that they heard the words "Hoist higher" uttered, and Johnson affirming that he gave the signal himself. It is significant, however, that these men all testify to having heard a signal consisting of exactly the same words, and that Johnson apparently studiously avoided stating as to who gave it until he was cross-examined. From Johnson's own testimony, it appears that he was solely an officious meddler, who was not engaged for Whitehouse, or in his employ; nor was he in the employ of the lighterage company, but simply an outside party, with authority from no one. And it is altogether unlikely that a person of this sort would be giving the signals for conducting the work to the parties concerned. There is, as between this evidence and that of plaintiff, a direct conflict, and the jury are the exclusive judges of the weight of the evidence. It is for them to determine whether witnesses speak the truth, or whether they are worthy of belief, and, it being altogether clear that reasonable men might differ as to the result, it was the proper function of the jury in the present controversy to determine the fact as to whether this signal, "Hoist higher," was ever given or not, and as to whether the action of the defendant was controlled thereby. If there was no such signal given, and he continued to hoist the pipe without one, which caused the breaking of the line, then he was guilty of negligence. We think that the case was properly left to the jury for their determination. It may be questionable whether the especial point urged is within the pleadings, it having been alleged that defendant was given a signal by plaintiff, or his fellow servants, to hoist the pipe or conduit higher; but it has been so treated by counsel upon both sides, and we have, accordingly, so considered it.

Reference is made by counsel to the allegation of the complaint that, in operating said conduit or suction pipe, it was necessary or customary to station a man between the derrick and the hoisting engine to watch the running of the lines, and to give warning in case of danger. The only proof as to the custom which prevailed in that regard is the evidence of Healy, who testifies that theretofore his duty was on the beach, to make the surf line fast, and that the man on the

beach gave the signals for raising and lowering the pipe. It appears, however, that on this occasion the lighterage company was short of help, and that Healy was not only discharging the duty of making the line fast, but was assisting the plaintiff on the barge, and that the signals to hoist the pipe were all being given from the barge. It is not improbable that Whitehouse knew of this condition, by reason of the fact that he could see the barge a part, if not all, of the time from where he was employed, and was in a position to observe who was assisting there, and in what manner the men were discharging their duty. So that, while this allegation is contained in the complaint, it is surplusage merely, and it was not necessary that it should have been in there. There exists a good cause of action without it, and it was a thing for the jury to determine, as we have seen, whether the defendant was guilty of negligence as otherwise charged. The motion for an instructed verdict was therefore properly denied.

The next ground of error is based upon the refusal of the trial court to give instructions which were requested by the defendant. These are contained in three clauses. As to the first two, it is very clear, from a reading of the instructions given by the court, that they were fully and fairly covered by the general charge. The third clause is as follows:

"The plaintiff was also bound to use ordinary care and precaution not to expose himself in any unnecessary danger, and to keep in a safe place in case of danger; and in doing so he should exercise all his faculties of seeing and hearing. And if, by so exercising his faculties of seeing and hearing, he could have anticipated the danger in time to escape to a place of safety, it was his duty so to do, and a failure in such cases to use ordinary care, as intimated, would be fatal to his recovery."

While this instruction may not be so fully covered, it was not necessary that it should be given, as the case, under the pleadings and evidence, does not call for it. The answer does not set up any contributory negligence on the part of the plaintiff; nor does the evidence anywhere tend to show that plaintiff was injured because he did not use due care in seeking a place of safety. So that the instruction was abstract and irrelevant.

The third ground of error consists of an exception to an instruction given, as follows:

"You are instructed that pain and suffering are naturally connected with all physical injuries, and may be considered as the direct and proximate results thereof, and, when physical injury results from the negligent or willful act of another, a recovery may be had for the pain and suffering connected with such injury, both at the time of its occurrence and subsequently; such recovery being in law in the nature of an award of compensatory damages."

It is urged that there is no allegation in the pleadings as to any willful act or wrong done by the defendant, and that the natural tendency of the use of the term "willful" in the instruction was to suggest to the jury that the defendant knowingly or purposely inflicted the injury. But it is entirely manifest that the jury could not have been misled by the use of the word, and elsewhere the court instructed especially that compensation should be the measure of damages. The

trial court committed no error, therefore, touching the instructions either given or refused.

These considerations lead to the affirmation of the judgment rendered, and it is so ordered.